IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| Kim Gentry, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:08-cv-00123 |
| | ) Judge Echols |
| The Hershey Company, | ) Magistrate Judge Knowles |
| Liberty Distribution, LLC and | ) |
| PETCO Animal Supplies, Inc., | ) |
| | ) |
| Defendants. | ) |

## THE HERSHEY COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant The Hershey Company ("Hershey"), by and through counsel, submits this memorandum of law in support of its motion for summary judgment.

### RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

#### The Incident

On November 28, 2007, plaintiff Kim Gentry, accompanied by her dog "Baybee," entered the PETCO retail store in Cookeville, Tennessee in order to purchase a pet carrier. (Verified Complaint, ¶ 8; Gentry Depo., at p. 49). While shopping, she picked up a York Peppermint Pattie from the shelf and began eating the candy without purchasing it. (Gentry Depo., p. 51, 63–64). After eating almost half of the candy, she noticed one or more "worms," or larva, in or on the candy. (Gentry Depo., p. 61–62). Gentry does not know whether she actually ingested any worm, larva, or other insect. (Gentry Depo., p. 63). Nevertheless, Gentry seeks damages for personal injuries and emotional distress from the manufacturer of the candy (Hershey), the distributor of the candy (Liberty), and the retailer of the candy (PETCO).

1

The Manufacturing Process

Hershey maintains an extensive quality control program to ensure that all raw materials and finished products are fit for consumption, that food packaging materials are safe and suitable, and that all of the foregoing materials and products are in compliance with the Federal Food, Drug and Cosmetic Act. Hershey's program provides for proper transportation of products, storage in cool, dry areas, good housekeeping practices, routine product rotation, and periodic inspections. (Arentz Decl., ¶ 4).

With respect to outside suppliers of goods, Hershey requires that its approved suppliers guarantee to Hershey that they are in compliance with current U.S. Food and Drug Administration standards and that each supplier meets Hershey's own quality standards. Suppliers of raw or semi-processed materials are audited on a regular basis by Hershey or an approved third party auditor. Pest control procedures are closely examined to confirm that they are being employed and executed. During an inspection of a supplier's facility, Hershey closely examines the supplier's sanitation practices and records of Hershey suppliers are also closely examined. Sanitation and insect control standards are only two of many items considered before a supplier is placed on Hershey's approved list. (Arentz Decl., ¶ 5).

There are many processes in place at Hershey that ensure that no live insects could survive the manufacturing process. During Hershey's manufacture of chocolate products, there are several steps in the processing operation that are sufficient to destroy all stages of insect life:

    (a)    Chocolate production—The air temperature during the roasting process reaches between 700–900 degrees Fahrenheit.

    (b)    Crème center production—Ingredients are batched and processed to a temperature of approximately 190 degrees Fahrenheit. The liquid crème is then deposited and allowed to set-up into its round mint shape after which the formed centers are sent to the enrobing area to be coated with chocolate.

2

(c) Enrobing—The chocolate mixture is received in tanker trucks and then pumped through a closed piping system to the storage and enrobing areas. The chocolate mixture is passed through a 35-mesh screen (with openings significantly smaller than a typical window screen).

(d) Cooling—After enrobing, the mints enter cooling tunnels where bars are cooled. Temperatures in these cooling tunnels range from 35–50 degrees Fahrenheit. A production employee inspects the bars as they exit the cooling tunnel. Any bars that are imperfect are removed and discarded. The accepted product is then immediately wrapped, packaged and placed into shipping cases.

(Arentz Decl., ¶ 6).

Throughout the manufacturing process the product is protected from contamination by the use of approved pest control techniques, acceptable sanitation practices, and environmental controls. A sound program of pest control is conducted by Orkin, whose personnel are trained in extermination and pest control maintenance procedures utilizing traps, insecticides, rodenticides, stored product moth pheromone lures/traps, etc. to prevent any possible pest problems. At least once every year the plant is thoroughly inspected by a Hershey sanitation inspection team. Hershey's employees also routinely inspect the plant and equipment to ensure that there are no signs of insect infestation. (Arentz Decl., ¶ 7).

All finished products are stored by Hershey in cool, dry areas prior to shipment. Once the product is manufactured, it is initially stored in Hershey-monitored Distribution Centers that have controlled temperatures, relative humidity, and are audited for sanitation and infestation on a routine basis. Generally recognized pest control practices and pesticides are used to prevent infestation. Hershey uses only trucks and containers that carry food products and that are equipped with refrigeration units for shipments from the Hershey plant to Hershey-monitored Distribution Centers or directly from the Distribution Center to the customer upon request. All

3

finished goods carriers are inspected for, among other things, infestation. If any is found, the carrier is rejected. (Arentz Decl., ¶ 9).

The instructions printed on the shipping containers are:

> IMPORTANT - KEEP IN A COOL DRY PLACE. The goods should not be exposed to dampness, extreme heat, or placed near drugs, oils, tobacco, or anything from which the Product would absorb the odor. Store and display in a sanitary, pest-free environment separated from goods which may harbor pests. Give us complete information of such circumstances.

(Arentz Decl., ¶ 10). Once the product is delivered to the customer's distribution center or retail/wholesale stores, control of the product is transferred to the customer. (Arentz Decl., ¶ 11).

The York Peppermint Pattie at issue in this matter was manufactured by Hershey in accordance with the above outlined process, including all quality control measures, to ensure that it met with Hershey's specifications and standards for this product, as well as all federal regulations. Hershey complied with all federal regulations regarding the manufacture of the York Peppermint Pattie in dispute in this case, and denies that this York Peppermint Pattie was contaminated with any type of insect or moth or was otherwise defective or unreasonably dangerous when it left Hershey's control. (Arentz Decl., ¶ 12).

<u>The Distribution Process and Chronology</u>

The York Peppermint Pattie at issue in this case was manufactured or produced by Hershey at its Reading, Pennsylvania facility on March 5, 2007. (Arentz Decl., ¶ 2). Only four days prior to this production date, Orkin Technician Jarod Abby performed a pest control inspection and service on March 1, 2007 at the Reading facility. (Arentz Decl., ¶ 8). The environmental inspection was good and no infestation was noted. (*Id.*).

The candy product was then transported to Hershey's Distribution Center on March 5 or 6, 2007 in a refrigerated truck. (Arentz Decl., ¶¶ 3, 9). On May 22, 2007, Hershey shipped the

4

candy product to the Memphis facility of Liberty Distribution, LLC. (Arentz Decl., ¶ 3). Liberty received the candy product on May 24, 2007. (Schweikert Aff., ¶ 5). At the time the candy product was shipped on May 22, 2007, Hershey ceased possession of and control over the candy product. (Arentz Decl., ¶ 3).

On June 14, 2007, Liberty shipped the candy product to PETCO's Cookeville, Tennessee retail store. (Schweikert Aff., ¶ 9). PETCO was in possession of the candy product from that point until Ms. Gentry discovered the contaminated product on November 28, 2007. (Schweikert Aff., ¶ 10). In sum, the insect contamination was discovered over six months after the candy product left Hershey's control.

Claims and Defenses

Gentry filed suit almost one year after the November 28, 2007 incident alleging claims of strict product liability, breach of warranty, and negligence against Hershey, Liberty, and PETCO. Hershey filed its answer denying that it was liable to Gentry under any of these theories. (Hershey Answer, Docket Entry No. 19, *passim*). Similarly, neither Liberty nor PETCO pled comparative fault (as to Hershey) as an affirmative defense or otherwise alleged that Hershey was at fault for the contamination. (Liberty Answer, Docket Entry No. 13, *passim*; PETCO Answer, Docket Entry No. 16, *passim*). In fact, PETCO specifically denied that the candy product was defective or unreasonably dangerous at the time it left the control of any of the defendants, including Hershey, or that any of the defendants, including Hershey, was liable under any theory of recovery. (PETCO Answer, ¶¶ 11–13). These allegations and denials are solidified because the time for amending the pleadings expired on June 24, 2009. (*See* Docket Entry No. 21, ¶ VI(C), p. 8).

Expert Opinions on Contamination

The experts for Gentry, Hershey, and Liberty are virtually unanimous in their opinion as to the type of insect discovered in the PETCO store on November 28, 2007 and the time frame for the origination of this contamination. Specifically, Gentry's expert, Dr. Bhadriraju Subramanyam of Kansas State University, provided the opinion that the insect discovered by Gentry was the larva of an Almond Moth. (Subramanyam Report, p. 1). Hershey's expert, Dr. Richard W. Merritt of Michigan State University, also opined that the insect discovered by Gentry was the larva of an Almond Moth. (Merritt Decl., ¶ 4).[1] Both of these experts also concluded that the origin of the contamination occurred anywhere from 25 to 60 days prior to discovery, meaning late September 2007 to late October 2007—several months after the candy product left Hershey's control. (Subramanyam Report, p. 1; Merritt Decl., ¶ 6). Liberty's expert also agrees—his opinion is that the contamination occurred after the candy product left Liberty's control on June 14, 2007. (Brower Aff., ¶ 8). In short, all experts agree that the contamination of the candy product did not occur during Hershey's manufacturing process or otherwise while under Hershey's control.

## LAW AND ARGUMENT

With all experts in agreement, this case is ripe for summary judgment as to Hershey. Although Gentry's Complaint asserts strict liability, breach of warranty and negligence claims against Hershey, because this is a personal injury case, all of the claims fall within the scope of and are governed by the Tennessee Products Liability Act of 1978, TENN. CODE ANN. § 29-28-101, *et seq.* The Act defines a product liability action as follows:

---

[1] Liberty's expert, Professor Andrew Van Zandt Brower of Middle Tennessee State University, opined that the insect was the larva of an Indian Meal Moth. (Brower Aff., ¶ 3). This difference of opinion, however, is of no consequence because the Almond Moth and the Indian Meal Moth are closely related with only small taxonomical differences. (Merritt Decl., ¶ 4). Moreover, both insects are "secondary pests," have similar life cycles, and attack the same food items. (Merritt Decl., ¶ 8).

6

> "Product liability action" for purposes of this chapter includes all actions brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging, or labeling of any product. "Product liability action" includes, but is not limited to, all actions based upon the following theories: strict liability in tort; *negligence; breach of warranty, express or implied*; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation, concealment, or nondisclosure, whether negligent or innocent; or *under any other substantive legal theory in tort or contract whatsoever*.

TENN. CODE ANN. § 29-28-102(6) (emphasis added). Accordingly, regardless of how Gentry styled her claims, they are product liability claims with respect to Hershey. For the reasons explained below, the undisputed material facts require that a judgment as a matter of law be entered on all of these claims.

I. HERSHEY IS ENTITLED TO SUMMARY JUDGMENT ON GENTRY'S CLAIMS BECAUSE THE UNDISPUTED FACTS, INCLUDING THE OPINIONS OF ALL EXPERTS, REVEAL THAT THE CANDY PRODUCT WAS NOT DEFECTIVE OR UNREASONABLY DANGEROUS AT THE TIME IT LEFT HERSHEY'S CONTROL.

As detailed below, Hershey complied with all applicable regulations in producing the York Peppermint Pattie at issue in this case, which provides Hershey with a rebuttable presumption that the product was not unreasonably dangerous. Moreover, all experts agree that the insect contamination occurred many months after the candy product left Hershey's control, which eliminates the claim that Hershey produced a defective candy product.

A. There is a Statutory Presumption that the Candy Product was not Unreasonably Dangerous.

Tennessee's Products Liability Act provides that "[c]ompliance by a manufacturer or seller with any federal or state statute or administrative regulation existing at the time a product was manufactured and prescribing standards for design, inspection, testing, manufacture, labeling, warning or instructions for use of a product, shall raise a rebuttable presumption that the product is not in an unreasonably dangerous condition in regard to matters covered by these

7

standards." TENN. CODE ANN. § 29-28-104. This provision is designed "to give refuge to the manufacturer who is operating in good faith and [in] compliance with what the law requires him to do." *Tuggle v. Raymond Corp.*, 868 S.W.2d 621, 625 (Tenn. Ct. App. 1992).

It is undisputed that the manufacture or production of the York Peppermint Pattie at issue complied with the Federal Food, Drug and Cosmetic Act as well as all federal regulations. (Arentz Decl., ¶¶ 4, 12). Accordingly, there is a statutory presumption that this candy product was not in an unreasonably dangerous condition at the time it left Hershey's control. No party has disclosed an expert opinion or otherwise provided evidence that Hershey's manufacturing process did not comply with all applicable regulations. (Docket Entry No. 29, *passim*; Schweikert Aff., *passim*). Without evidence that Hershey failed to comply with the applicable statutory regulations during the manufacture of the candy product, Hershey is entitled to summary judgment. *See Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991) (applying Tennessee law) (affirming summary judgment entry in favor of manufacturer based on plaintiff's failure to overcome rebuttable presumption created by manufacturer's affidavit stating that the company complied with pertinent federal regulations concerning the product's warnings).

B. <u>The Undisputed Expert Proof Reveals that the Insect Infestation did not Occur during Hershey's Manufacturing Process and, accordingly, it is Undisputed that the Candy Product was not Defective or Unreasonably Dangerous at the Time it Left Hershey's Control.</u>

The Product Liability Act also permits the finding of liability against a manufacturer or seller of a product if the product was defective, but only under the following requirements:

> A manufacturer or seller of a product shall not be liable for any injury to a person or property caused by the product unless the product is determined to be in a *defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.*

8

Case 2:08-cv-00123 Document 58 Filed 11/02/09 Page 8 of 14 PageID #: 550

TENN. CODE ANN. § 29-28-105(a) (emphasis added). The term "defective condition" is defined in the Act specifically as one that "renders [the product] unsafe for normal or anticipatable handling or consumption." TENN. CODE ANN. § 29-28-102(2).

Based on this statutory requirement, for Gentry to avoid summary judgment, she must be able to demonstrate that the candy product at issue was in a defective condition when it left the control of Hershey. *See Davis v. Komatsu Am. Indus. Corp.*, 42 S.W.3d 34, 42 (Tenn. 2001); *Whaley v. Rheem Mfg. Co.*, 900 S.W.2d 296, 299 (Tenn. Ct. App. 1995) ("[i]n order to prevail in a products liability action, a plaintiff must prove that the product in question was either defective or unreasonably dangerous, as those concepts are defined in the Act, at the time it left the control of the manufacturer or seller"); *Masters v. Rishton*, 863 S.W.2d 702, 706 (Tenn. Ct. App. 1992). In other words, the plaintiff must demonstrate that there was actually something wrong with the product, and not simply "show that the product caused [their] injury or was involved in it." *See Shoemake v. Omniquip Intern., Inc.*, 152 S.W.3d 567, 573 (Tenn. Ct. App. 2003); *Whaley*, 900 S.W.2d at 300. "An injury in and of itself is not proof of a defect and thereby does not raise any presumption of defectiveness." *Shoemake*, 152 S.W.3d at 573 (citing *Fulton v. Pfizer Hosp. Prods. Group, Inc.*, 872 S.W.2d 908, 911 (Tenn. Ct. App. 1993)). The undisputed facts and unanimous expert proof reveals that (1) Hershey's manufacturing process did not allow for the candy product to leave its control in a defective condition, and (2) the insect contamination occurred months after the product left Hershey's control. As a result, Hershey is entitled to summary judgment.

9

1. <u>Hershey's Manufacturing Process Prevented the Candy Product from Leaving Hershey's Control in a Defective Condition.</u>

As detailed above, the York Peppermint Pattie was produced on March 5, 2007. Only four (4) days earlier, Hershey had an Orkin Technician perform a pest control inspection and service at the facility where the candy product was manufactured. This inspection found no problems and no insect or other infestation was noted. (Arentz Decl., ¶¶ 2, 8). Not only was there a clean bill of inspection just days before this product was produced, but Hershey utilizes approved pest control techniques throughout its entire manufacturing process. Hershey maintains a pest control program operated by Orkin, whose personnel are trained in extermination and pest control maintenance, procedures utilizing traps, insecticides, rodenticides, stored product moth pheromone lures/traps, and other measures to prevent any possible pest problems. (Arentz Decl., ¶ 7).

In addition to these pest control processes, the structure of Hershey's manufacturing process ensures that no live insect could survive the production of the York Peppermint Pattie. In fact, there are several steps in the process operation that are sufficient to destroy all stages of insect life. These include a roasting process wherein the chocolate is heated to a temperature of between 700 and 900 degrees Fahrenheit, as well as a process where the crème center is heated to a temperature of 190 degrees Fahrenheit. The chocolate is also pumped through a closed piping system where it passes through a 35-mesh screen for filtration purposes. The finished product is then cooled in the temperature range of 35–50 degrees Fahrenheit and then stored in Hershey-monitored Distribution Centers that have controlled temperatures, relative humidity and are audited for sanitation and infestation on a routine basis. (Arentz Decl., ¶¶ 6, 9).

10

Based upon this thorough manufacturing process, Hershey's expert, Dr. Merritt, provided the opinion that the Almond Moth discovered by Gentry on November 28, 2007 could not have originated or otherwise been present in Hershey's manufacturing process. (Merritt Decl., ¶ 8). In fact, the manufacturing process and pest control methods utilized by Hershey negates the possibility that the Almond Moth discovered by Gentry contaminated the York Peppermint Pattie during Hershey's manufacturing process because this moth could not survive in this environment. (*Id.*).

No other party has provided any expert opinion as to Hershey's manufacturing process, including its pest control procedures, or whether the Almond Moth discovered by Gentry on November 28, 2007 could have originated in this environment or survived in this environment. In short, it is undisputed that Hershey's manufacturing process eliminates the claim that the York Peppermint Pattie ingested by Gentry was contaminated with insects or otherwise defective when it left Hershey's control. As such, Hershey is entitled to summary judgment.

2. <u>The Unanimous Expert Proof Shows that the Contamination Occurred Many Months after the Candy Product Left Hershey's Control.</u>

It is undisputed that the York Peppermint Pattie at issue left Hershey's control on May 22, 2007. (Arentz Decl., ¶ 3; Schweikert Aff., ¶ 5). It is also undisputed that the Almond Moth was discovered in the candy by Gentry on November 28, 2007—over six months after the product left Hershey's climate-controlled distribution center. (Verified Complaint, ¶ 8). Further, all experts agree that the moth discovered by Gentry was larva and specifically not pupae or adults. (Merritt Decl., ¶ 6; Subramanyam Report, p. 1; Brower Aff., ¶ 8). All experts agree that, based upon the life cycle of these moths, the genesis of the moth infestation occurred anywhere between 25 and 60 days prior to Gentry's discovery. (Merritt Decl., ¶¶ 6–7; Subramanyam

11

Report, p. 1). Accordingly, the experts unanimously conclude that the contamination originated between late September 2007 and late October 2007, (*id.*), at least four (4) months after the candy product left Hershey's control. Accordingly, the undisputed facts reveal that Hershey's York Peppermint Pattie was not defective or unreasonably dangerous at the time it left Hershey's control. With no evidence to the contrary, Gentry's product liability, breach of warranty, and negligence claims fail as a matter of law.[2]

## II. SUMMARY JUDGMENT IN FAVOR OF HERSHEY SHOULD BE ENTERED AS A FINAL JUDGMENT.

Rule 54 of the Federal Rules of Civil Procedure provides, in pertinent part, that, "when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." FED. R. CIV. P. 54(b). This rule "attempts to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties." *Corrosioneering, Inc. v. Thyssen Envtl. Sys.*, 807 F.2d 1279, 1282 (6th Cir. 1986). In order to strike this balance, the Sixth Circuit applies the following nonexhaustive factors to each case while allowing the district court to make the determination at its discretion:

1. The relationship between the adjudicated and the unadjudicated claims;
2. The possibility that the need for review might or might not be mooted by future developments in the district court;
3. The possibility that the reviewing court might be obliged to consider the same issue a second time;
4. The presence or absence of a claim or counterclaim which could result in a set-off against the judgment sought to be made final;

---

[2] Gentry's breach of warranty claim is subsumed under the products liability act. TENN. CODE ANN. § 28-9-28-102(6). Even if analyzed outside the confines of this Act, the requirement for the imposition of liability is the same—the product or good must be unmerchantable at the time it left Hershey's control. *Leach v. Wiles*, 429 S.W.2d 823 (Tenn. Ct. App. 1968). The undisputed fact that the contamination occurred four (4) months after the candy left Hershey's control thus negates Gentry's breach of warranty claim even if considered separately.

12

Case 2:08-cv-00123   Document 58   Filed 11/02/09   Page 12 of 14 PageID #: 554

5. Miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

*Akers v. Alvey*, 338 F.3d 491, 495 (6th Cir. 2003). The determination of whether to enter a Final Judgment is made on a case-by-case basis at the district court's discretion. *Id.*; *see also Harlan v. Torrence*, No. 3:08–0950, 2009 WL 1407001 (M.D. Tenn. May 19, 2009). (A copy is attached).

Application of these factors weighs in favor of directing entry of summary judgment for Hershey as a final judgment. Given the undisputed facts, including the unanimous opinions of the experts for Gentry, Liberty, and Hershey, there is no correlation between Gentry's claims against Hershey and her claims against the other defendants. Moreover, based upon these undisputed facts and expert opinions, there is little possibility that future developments in this case will moot the appeal by any other party. Likewise, there is little to no possibility that the Sixth Circuit would be asked to consider the issue—Hershey's manufacturing process and whether the candy product was defective or unreasonably dangerous at the time it left Hershey's control—a second time. There are no counterclaims, cross-claims, or third-party claims that could result in a set-off. And, finally, requiring Hershey to remain subject to an appeal months later and thereby forcing Hershey to monitor future proceedings in this case will result in expense and delay for Hershey that are unnecessary, particularly in a case where Gentry's expert and Hershey's expert agree that the contamination did not originate or occur while the candy was under Hershey's control. In short, there is no just reason for delaying the finality of this judgment in favor of Hershey. *See, e.g., Harlan*, 2009 WL 1407001, at * 2 (granting one defendant's motion for judgment on the pleadings and directing that the judgment be entered as a Final Judgment in accordance with Rule 54).

13

Case 2:08-cv-00123 Document 58 Filed 11/02/09 Page 13 of 14 PageID #: 555

## CONCLUSION

For all of the foregoing reasons, The Hershey Company requests that all of Gentry's claims be dismissed in their entirety. Moreover, as there is no just reason for delay, Hershey requests that the order dismissing Gentry's case against it be entered as a Final Judgment pursuant to Rule 54 of the Federal Rules of Civil Procedure.

/s/ E. Todd Presnell
E. Todd Presnell
Charlnette A. Richard
Miller & Martin PLLC
150 Fourth Avenue North
Suite 1200
Nashville, Tennessee 37219
615-244-9270

*Counsel for Defendant The Hershey Company*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of November, 2009, a true and correct copy of the foregoing was served on the party listed below and on all parties by the court's ECF: William F. Roberson, Jr., 320 E. Broad Street, Cookeville, Tennessee 38501; Lori J. Keen and Scott McCullough, 81 Monroe Avenue, Sixth Floor, Memphis, Tennessee 38103; and James C. Wright, 2701 Kingston Pike, Knoxville, Tennessee 37901.

/s/ E. Todd Presnell