## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

KIM GENTRY,           )
                             )
        **Plaintiff,**       )
                             )
     **v.**                  )     **Case No. 2:08-0123**
                             )     **Judge Echols**
**THE HERSHEY COMPANY,**   )
**LIBERTY DISTRIBUTION, LLC, and** )
**PETCO ANIMAL SUPPLIES, INC.,**  )
                             )
        **Defendants.**     )

## MEMORANDUM

      While shopping at a Petco Store in Cookeville, Tennessee, Plaintiff Kim Gentry (Plaintiff or "Ms. Gentry") picked up a York Peppermint Pattie which was on display for sale, bit into it, and discovered that it was infested with insect larvae. Subsequently, she filed suit in the Putnam Circuit Court against the retailer, Defendant Petco Animal Supplies, Inc. ("Petco"), the manufacturer, Defendant The Hershey Company ("Hershey"), and the distributor, Defendant Liberty Distribution, LLC ("Liberty Distribution"). Plaintiff claims that (1) Defendants are strictly liable under T.C.A. § 29-28-105 and Section 402(a) of the Restatement of Torts, Second (as adopted in Tennessee) for injury or illness caused by a defective or unreasonably dangerous product; (2) Defendants breached expressed and implied warranties under Tennessee's adaptation of the Uniform Commercial Code, T.C.A. §§ 47-2-313 & 314, because the York Peppermint Pattie was unfit for human consumption; and (3) Defendants were negligent and/or negligent *per se* by preparing, packaging, storing, transporting, and/or selling a product in an unsanitary condition and/or allowing it to become contaminated. Plaintiff seeks both compensatory and punitive damages.

1

After Hershey removed the case to this Court, each Defendant filed a Motion for Summary Judgment (Docket Entry Nos. 51, 56 & 62). In addition, Liberty Distribution and Petco seek dismissal and/or summary judgment on Plaintiff's punitive damages request (Docket Entry Nos. 54 & 57). If the Court does not dismiss the punitive damages claim, Petco requests that the issue of punitive damages be bifurcated from the issue of liability and compensatory damages. (Docket Entry No. 65). Petco also requests that the Court not consider an affidavit filed by Plaintiff's expert because the same allegedly is untimely. (Docket Entry No. 89). The motions have been fully briefed by the parties. (Docket Entry Nos. 67, 69, 71, 75, 88, 91, 92 , 93 & 95).

## I. FACTUAL BACKGROUND

Plaintiff was a frequent customer at Petco's store number 1637 in Cookeville. Virtually every time Plaintiff visited the store, she brought one of her dogs with her to ride in the shopping cart and she would get a treat for the dog from the "treat island" at the store. After getting a treat for her dog, Plaintiff also would then retrieve and eat a York Peppermint Pattie which was on display at a candy stand at the store. The candy display was within an approximate 15 foot radius of various bird foods. It was Plaintiff's practice to pay for both the dog treat and the Peppermint Pattie when checking out of the store.

York Peppermint Patties are manufactured by Hershey. The patties are individually wrapped in silver foil and sealed at each end of the packaging.

On November 28, 2007, Plaintiff pulled a York Peppermint Pattie out of the candy stand at the Cookeville Petco store. At the time she did not notice anything unusual about the product or its packaging and she proceed to walk around the store.

Plaintiff first noticed a problem with the York Peppermint Pattie after opening the package and biting into the candy. When she bit into the pattie, she noticed something "crunchy" in her mouth which was not the expected texture of a York Peppermint Pattie. When Plaintiff looked at the pattie, she observed at least one wormlike creature and black dots which she assumed to be feces.

Upon discovering the infestation, Plaintiff showed the candy to the store manager on duty. Plaintiff then visited her doctor, complaining of nausea and vomiting, and was treated for food poisoning. Plaintiff claims that discovering the larvae in the candy was traumatic and she has undergone a steady and intensive regimen of psychological counseling, which continues to date.

Petco employees routinely check expiration dates of the candies for sale to ensure that they have not expired, and are supposed to see if any of the candy has torn or open packaging. The York Peppermint Pattie at issue in this case did not have an expired expiration date, and it is unclear whether there were any tears or holes in the packaging before Plaintiff opened the wrapping.

After the subject incident, the General Manager at Petco's Cookeville store, Kelly Darty ("Ms. Darty"), was called at home. Upon her arrival at work the following morning, Ms. Darty opened approximately ten remaining York Peppermint Pattie packages in the display and observed larvae or webbing inside approximately four of those packages. She then called Liberty Distribution to complain about the infestation and was allegedly told to discard the product and a replacement order would be shipped to the store.

The York Peppermint Pattie at issue in this case was manufactured by Hershey at its Reading, Pennsylvania facility on March 5, 2007. Hershey's suppliers must guarantee that they are in compliance with United States Food and Drug Administration ("FDA") standards, as well as Hershey's own quality standards. Suppliers are regularly audited by Hershey or a third-party

3

auditor, and such audits include an examination of pest control procedures and sanitation practices. Likewise at its own facilities, Hershey is concerned about its sanitation practices and environmental controls and utilizes Orkin Extermination Company ("Orkin") for pest control maintenance. In fact, four days prior to the manufacture of the mint pattie at issue in this case, Hershey's Reading facility was inspected by an Orkin technician who noted no infestation of pests.

York Peppermint Patties consist of a mint crème center covered by chocolate. The chocolate mixture is received in tanker trucks and then sent via closed piping system through a 35-mesh screen to the storage and production areas at Hershey. During the chocolate production process, the air temperature reaches between 700 and 900 degrees Fahrenheit. The ingredients in the crème center are batched and processed to a temperature of approximately 190 degrees Fahrenheit and set into a round mint shape. The formed mint centers are then sent to the production area where they are covered with chocolate in a process called "enrobing."

After enrobing, patties are sent through cooling tunnels of between 35 and 50 degrees Fahrenheit, and, upon exiting, are inspected by production employees. Patties that pass inspection are then immediately wrapped, packaged, and placed into shipping cases which carry the following label:

> IMPORTANT – KEEP IN A COOL DRY PLACE. The goods should not be exposed to dampness, extreme heat, or placed near drugs, oils, tobacco, or anything from which the Product would absorb the odor. Store and display in a sanitary, pest-free environment separated from goods which may harbor pests. Give us complete information in such circumstances.

(Arentz Decl. ¶ 10).

In the instant matter, the case containing the York Peppermint Pattie was transported by refrigerated truck to Hershey's Distribution Center on March 5 or 6, 2007 where it was stored in a

4

controlled environment. On May 22, 2007, Hershey shipped the candy product to Liberty Distribution's Memphis facility where it arrived on May 24, 2007.

Liberty does not manufacture products; rather, it is a distributor of products. Liberty received the York Peppermint Pattie at issue in a sealed, corrugated cardboard box. That box, in turn, contained a sealed inner package and inside that inner package, individual York Peppermint Patties which were individually wrapped in foil paper. Liberty shipped the sealed York Peppermint Pattie box to Petco's Cookeville store on June 14, 2007, meaning that Liberty had possession of the box for approximately three weeks at its warehouse in Memphis, Tennessee. That warehouse is a modern storage facility which is temperature-controlled.

From June 14, 2007 until November 28, 2007, the York Peppermint Pattie container was in the exclusive control of Petco. The box was unsealed at the Petco store, the interior box was opened, and the individual Peppermint Patties in their foil wrappings were placed on a display stand only a short distance away from the food products and the dog treat island.

The infestation in this case has been described as that of an Indian Meal Moth or an Almond Moth. Both types of moths are considered infesting moths in grains, including dog food, bird seeds, and other types of pet foods.

Plaintiff's expert, Dr. Bhadriraju H. Subramanyam ("Dr. Subramanyam"), an entomology professor in the Department of Grain Science and Industry at Kansas State University who has studied insects for over 28 years, identified the larvae found in the York Peppermint Pattie as being from an adult Almond Moth which is an "insect pest" related to the Indian Meal Moth. After examining pictures of the pattie containing the larvae, Dr. Subramanyam opined:

> Based on what I can see from the pictures, I found only larvae on the patty and inside the wrapper, along with webbing produced by larvae. The larvae were feeding on

5

the patty and there is evidence of fecal pellets as well as webbing, characteristic of damage caused by these larvae. The fact that pupae, adults and small larvae were not observed in the pictures, and understanding that the patty has been in Petco's possession for more than a month, I conclude the infestation to have occurred in the Petco store. Typically, it takes 25-30 days for eggs to develop into fully grown larvae, assuming a temperature of Petco's was around 70-75°.

(Docket Entry No. 29 at 24).

Liberty Distribution's expert, Dr. Andrew Van Zandt Brower ("Dr. Brower"), a professor at Middle Tennessee State University, indicates that the larvae is Indian Meal Moth which, like the Almond Moth, is an infesting moth in grains. As for where the moth may have been introduced to the pattie in this case, Dr. Brower opines:

> 8. It is my opinion within a reasonable degree of certainty based upon my experience that the infestation of the product by an Indian Meal Moth did not occur at Liberty Distribution. This is for a number of reasons. One, the fact that the York Peppermint Pattie was only at the Liberty Distribution facility, an enclosed, air-conditioned facility, in an enclosed box for a short time (see attached shipping records, indicating a matter of just a few weeks). Two, Liberty Distribution has no history or record of any infestation issues or problems at its location. Three, it appears Liberty Distribution does not handle or ship or have within its facility any grain type products that would be in proximity to the York Peppermint Pattie such as to result in an infestation. Four, examining the photographs of the larvae, as well as the information provided by Karen Vail,[1] the infestation appears to consist only of larvae. The timing of the life cycle of the Indian Meal Moth in temperature-controlled indoor conditions (70-75 Degrees Fahrenheit) is typically as follows: a gravid female would lay eggs that would hatch in two to fourteen days. The development of the larvae from egg to emergence of an adult moth typically takes 60-80 days, providing enough time for two generations within the 150 or more days that the product was outside the possession of Liberty Distribution.

---

[1]Karen Vail is a Professor and Extension Urban Entomologist at the University of Tennessee. She reported that Dr. Kevin Moulton, an entomological taxonomist in the Department of Entomology and Plant Pathology at the University of Tennessee, identified the larvae in the York Peppermint Pattie to be from an Indian Meal moth.

Examining the photographs and information provided, there are only a few larvae present, and no pupae or adults. The amount of feeding that has occurred and the size of the larvae in the photographs suggests that only a single generation has subsisted on the York Peppermint Patties [sic]. Also, there is no dead adults or pupal exuviae present. These facts indicate the infestation of the York Peppermint Patties [sic] did not originate at the Liberty Distribution facility.

(Dr. Brower Aff. ¶ 8).

Finally, Hershey's expert, Dr. Richard W. Merritt ("Dr. Merritt"), a professor of entomology at Michigan State University, believes that the larvae and webbing allegedly found in the peppermint pattie belongs to the Almond Moth family, but that such moths are closely related to the Indian Meal Moth and his opinions would be the same regardless of which moth caused the infestation. Dr. Merritt also opined as to the origin of the moth infestation, stating:

Based upon this time frame [the dates of manufacture and shipping to Petco] and the fact that only two larval insects (no pupa or adult) were found in the peppermint patti [sic], it is my opinion to a reasonable degree of certainty that the larval infection occurred approximately 30-60 days before the time that it was discovered by Ms. Gentry, or some time between late September 2007 and late October 2007. This would clearly place the start of the moth infestation occurring in the PETCO store and not in Hershey's factory at the time the Peppermint Pattie was produced.

(Dr. Merritt Aff. ¶ 7).

## II. STANDARD OF REVIEW ON MOTIONS FOR SUMMARY JUDGMENT

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson

7

v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. APPLICATION OF LAW

### A. Liberty Distribution's and Hershey's Motions for Summary Judgment (Docket Entry Nos. 51 & 56)

The Motions for Summary Judgment filed by Liberty Distribution and Hershey are relatively straightforward and assert that Plaintiff has not shown either Defendant can be found liable under the Tennessee Product Liability Act of 1978. Plaintiff has filed no response in opposition to Liberty Distribution's or Hershey's Motions for Summary Judgment and the Court finds those motions to be well-taken.

The Tennessee Product Liability Act of 1978 is encompassing, by providing in relevant part as follows:

8

"Product liability action" for purposes of this chapter includes all actions brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging or labeling of any product. "Product liability action" includes, but is not limited to, all actions based upon the following theories: strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent, or innocent; misrepresentation, concealment, or nondisclosure, whether negligent, or innocent; or under any other substantive legal theory in tort or contract whatsoever[.]

T.C.A. § 29-28-102(6). Under the act, "[a] manufacturer or seller of a product shall not be liable for any injury to a person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller." T.C.A. § 29-28-105. A product is in a "defective condition" when the product is in a condition "that renders it unsafe for normal or anticipatable handling and consumption." T.C.A. § 29-28-102(2). "Unreasonably dangerous" for purposes of the statute "means that a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition." T.C.A. § 29-28-102(8).

There is no evidence that the York Peppermint Pattie at issue in this case was in a defective or unreasonably dangerous condition when it was in the hands of either Hershey or Liberty Distribution. Quite the contrary, all experts in this case agree that any infestation of the York Peppermint Pattie occurred while the product was in the exclusive possession and control of Petco.

Further, with regard to the claims against Hershey, there is no evidence that Hershey failed to comply with any federal, state, or administrative regulation in making, packaging, and shipping

9

the York Peppermint Pattie and there is therefore a statutory (albeit rebuttable) presumption that the pattie was not in an unreasonably dangerous or defective condition. T.C.A. § 29-28-104. As for the claims against Liberty Distribution, the undisputed evidence is that Liberty Distribution received the pattie in a sealed corrugated cardboard box, stored it in a temperature-controlled environment, and had no ability to inspect the individual patties in the box, meaning that Liberty Distribution is entitled to rely on the closed container doctrine which provides:

> No "product liability action," as defined in § 29-28-102(6), shall be commenced or maintained against any seller when the product is acquired and sold by the seller in a sealed container and/or when the product is acquired and sold by the seller under circumstances in which the seller is afforded no reasonable opportunity to inspect the product in such a manner which would, or should, in the exercise of reasonable care, reveal the existence of the defective condition.

T.C.A. § 29-28-106.

While Plaintiff does not respond to Hershey's and Liberty Distribution's Motions for Summary Judgment, Petco has done so. However, Petco's attempts to keep Hershey and Liberty Distribution in this case fails for two significant reasons.

First, Petco has asserted no claims against either Hershey or Liberty Distribution, nor has it alleged comparative fault. Quite the contrary, Petco's Answer denied fault as to all Defendants and Petco did not raise the issue of comparative fault in the Case Management Order, but instead, and without any explanation, waited until it filed responses to the other Defendants' Motion for Summary Judgment to first raise the issue. This is too late. See, Phelps v. McClellan, 30 F.3d 658, 663 (6th Cir. 1994)("Generally, a failure to plead an affirmative defense . . . results in the waiver of that defense and its exclusion from the case"); Pittman v. Franklin, 282 Fed. Appx. 418, 428 (6th Cir. 2008)(noting that in diversity action governed by Tennessee law, comparative fault was an affirmative defense which should have been pled); Allgood v. Gateway Health Sys., 2009 WL

10

3029593 at *2 (Tenn. Ct. App. 2009)(comparative fault is an affirmative defense under Tennessee law).

Second, and more fundamentally, Petco has failed to set forth evidence from which a reasonable jury could conclude that either Hershey or Liberty Distribution are liable for the infestation of the York Peppermint Pattie. Petco cites to the expert report of Dr. Subramanyam in which he states:

> Is it possible that the infestation could have originated at Liberty Distribution and/or Hershey? Unless there is more information about pest management practices and pest monitoring records at both of these locations it would be difficult to ascertain if these two entities are culpable. It is possible that the same species may be present in both these facilities. An on-site inspection and inspection of their pest management and food safety reports of both these facilities are needed before I can draw any firm conclusions. It is important to establish infestation of almond moths in peppermint patty products or similar consumer complaints from candy products shipped by Hershey and distributed by Liberty Distribution to exclude this isolated incident.

(Docket Entry No. 29 at 1).

This selective reference to Dr. Subramanyam's report ignores his conclusion in the very same report that "the infestation . . . occurred in the Petco store," (id.), and instead is a hypothetical response and speculation as to the possibility that Hershey or Liberty might be responsible for the infestation.[2] However, "[i]n order to survive a motion for summary judgment, the non-moving party must be able to show probative evidence that would permit a finding in [its] favor on more than mere speculation, conjecture, or fantasy." Lewis v. Philip Morris, Inc., 355 F.3d 515, 533 (6th Cir. 2004). Hypotheses, unsupported by evidence, are not enough to submit a case to a jury. See, Chappell v. City of Cleveland, 585 F.3d 901, 921 (6th Cir. 2009)("to withstand a properly supported motion for

---

[2]Dr. Subramanyam's response will remain hypothetical because discovery has closed in this case.

11

summary judgment, plaintiff must do more than rely merely on the allegations of her pleadings or identify a 'metaphysical doubt' or hypothetical 'plausibility' based on a lack of evidence").

Petco's reliance on Plaintiff's deposition testimony is likewise unavailing. When asked whether she had any knowledge of where the infestation may have occurred, Plaintiff testified that she did not know where the infestation occurred, but allowed, "It could have come from Hershey; it could have come from Liberty; it could have come from Petco. It came from one of them." (Pf. Depo. at 135). Later in her deposition, Plaintiff again stated that she did not know where the infestation occurred, but that it could have occurred in one of three places: Hershey, Liberty Distribution, or Petco. This testimony, of course, is nothing but rank speculation. The bottom line is that Plaintiff simply does not know where the infestation occurred, but the experts point to Petco.

Based on the foregoing, the Court will grant Liberty Distribution's and Hershey's Motions for Summary Judgment.[3] Prior to turning to Petco's Motion for Summary Judgment, the Court addresses one housekeeping matter.

In its Motion for Summary Judgment, Hershey requests that, if the Court grants its motion, the Court enter a final judgment as to it under Rule 54(b) of the Federal Rules of Civil Procedure. Rule 54(b) allows for the entry of final judgment as to less than all claims and/or less than all the parties where it is determined that there is no just reason for delay. The Sixth Circuit has identified factors which may be considered in determining whether to direct entry of a final judgment, including the relationship between adjudicated and unadjudicated claims, the possibility that review might be mooted by future developments, the possibility that a reviewing court may be required to

---

[3]Because the Court will enter summary judgment in favor of Liberty Distribution, its Motion to Dismiss or in the Alternative for Summary Judgment as to the Issue of Punitive Damages (Docket Entry No. 54) will be denied as moot.

12

consider the same issues a second time, and miscellaneous factors such as delay, expense, solvency considerations, and shortening the time of trial. Lowery v. Federal Express Corp., 426 F.3d 817, 822 (6th Cir. 2005). Ultimately, "[t]he district court must 'determine whether the needs of the parties' outweigh the efficiency of having one appeal at the conclusion of the case in its entirety, and it must spell out its reasons for concluding that prompt review is preferable.'" Id. at 822.

In this case, the Court sees no efficiency in allowing what essentially could be piecemeal appeals. Plaintiff's claims in this case are intertwined as to all Defendants and the Sixth Circuit could very well need to consider the same issues in subsequent appeals were a final judgment entered in Hershey's favor at this time. Further, because this case is set to be tried in the very near future, entering final judgment as to the claims against Hershey would serve no beneficial purpose. Accordingly, Hershey's request that a final judgment be entered on the claims against it will be denied.

**B. Petco's Motion for Summary Judgment (Docket Entry No. 62)**

In support of its motion for summary judgment, Petco raises a number of arguments, which the Court considers in the order presented.

Like Liberty Distribution, Petco relies upon the sealed container doctrine as a bar to Plaintiff's negligence and strict liability claims. However, unlike Liberty Distribution, Petco did not receive a closed corrugated box and distribute it elsewhere, but rather Petco received the corrugated box, unsealed it, and placed the opened interior box containing the peppermint patties in their foil wrapping out for display and sale. This is a critical distinction given the facts (or lack thereof) which have been developed in this case.

Petco argues it had no "'reasonable opportunity to inspect the product in such a manner which would, or should, in the exercise of reasonable care, reveal the existence' of the larvae and infestation found **inside** the wrapping and on the York Peppermint Patty [sic] itself," and that the only way to inspect the product would be to destroy it by opening the packaging. (Docket Entry No. 63 at 4, quoting T.C.A. § 29-28-106(a), bold in original). Whether Petco had a reasonable opportunity to inspect the product is, in this Court's view, open to question.

A fair reading of Ms. Darty's deposition testimony indicates that Petco's inspection procedures for the candies carried in the Cookeville store were somewhat lax. Ms. Darty indicates that when shipments of candies came in, the packing slip would be checked and boxes of the candies would be placed on a display shelf if there was room, or otherwise stored in the office. (Ms. Darty Depo. at 28). Employees received no formal training about possible contamination issues in placing candies and chocolates in close proximity to pet and wild bird food and there is no special care taken to segregate human food away from pet food. (Id. at 45-46). While employees were trained to discard any open packages of candy that they came across, they were not instructed to inspect any individual packages to see if contamination occurred, but instead would merely check quantities and see if the "sale by" date had expired. (Id. at 47).

Employees were, however, trained to pay attention to the expiration dates on the pet food (particularly wild bird food) which could contain "meal moths" and "to check the creases because the little bugs can get in the creases and you won't notice them." (Id. at 64-65). Nevertheless, while employees were instructed to look for "bugs in the fold of different packaging" (id. at 65), that instruction did not apply to the individual candy packages. According to Ms. Darty, the cashiers were responsible for checking the candy, but that merely required that they spot check the candy to

14

see if the expiration date had expired.  (Id. at 68 & 94). In fact, when Ms. Darty was informed about the infestation in this case, she did not examine the packaging to see if there were any tears or holes, but instead ripped open the packaging to see if there was any contamination of the product and then threw away all of the peppermint patties, allegedly on the advice from a Liberty Distribution employee.  (Id. at 47-48).  Ms. Darty also testified that even when the infested candy was found, she was merely instructed by her District Manager, Mike Ethridge, to do "spot checks" and to make sure that none of the candy products were out-of-date.  She was given no orders to do any extra cleaning or "extra intervention-type actions."  (Id. at 39 & 31).

A review of the sealed container doctrine in the context of the Tennessee Product Liability Act of 1978 suggests that the doctrine was intended to protect sellers from liability associated with latent defects passed to them from the manufacturer of the product, not to relieve the seller from all liability to the consumer when the seller causes or allows the product to become adulterated.  Under the facts of this case, the Court finds that there exists a genuine issue of material fact as to whether Petco had a reasonable opportunity to inspect the peppermint pattie consumed by Ms. Gentry.

Moreover, and as Petco recognizes, the sealed container doctrine does not apply to an "action based upon a breach of warranty, express or implied[.]" T.C.A." § 29-28-106(a).  Petco argues it made no express warranty to Plaintiff regarding the subject York Peppermint Pattie, a point which Plaintiff concedes (Docket Entry No. 72 at 9), and the Court will therefore grant summary judgment on Plaintiff's breach of express warranty claim.

As for an implied warranty, Petco first argues Plaintiff cannot establish breach of an implied warranty of fitness for a particular purpose and cites Lee's Home Center, Inc. v. Morris, 2006 WL 1716797 at *4 (Tenn. Ct. App. 2006)(citation omitted) which holds that such a claim "arises where

15

'the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods[.]"  However, <u>Lee's Home Center</u> dealt with T.C.A. § 47-2-315, not the more relevant T.C.A. § 47-2-314 which concerns the implied warranty of merchantability:

> (1) Unless excluded or modified (§ 47-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
> (2) Goods to be merchantable must be at least such as:
>> (a) pass without objection in the trade under the contract description; and
>> (b) in the case of fungible goods, are of fair average quality within the description; and
>> (c) are fit for the ordinary purposes for which such goods are used; and
>> (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
>> (e) are adequately contained, packaged, and labeled as the agreement may require; and
>> (f) conform to the promises or affirmations of fact made on the container or label if any.

T.C.A. § 47-2-314.

Petco argues that even under a theory of breach of implied warranty of merchantability, Plaintiff cannot recover because there was no "sale" for purposes of the statute.  Petco points to evidence which shows that at the time Plaintiff bit into the peppermint pattie, she was walking around the store and had not purchased the candy.

The code defines "contract of sale" as "including both a present sale of goods and a contract to sell goods at a future time."  T.C.A. § 47-2-106(1).  Further, "the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale."  T.C.A. § 42-2-314(1).

16

According to the undisputed testimony of Plaintiff, it was her practice to eat a peppermint pattie while her dog enjoyed his treat, and then pay for both items when she left the store. There is no evidence that Petco at any time objected to this practice and, for purposes of the statute, the Court finds that this amounts to a "sale."

Petco's suggestion that a "sale" only occurs when payment is received would eliminate any cause of action for breach of implied warranty of merchantability by restaurant patrons who discover foreign objects in their food prior to paying their bills. This is a result which the drafters of the statute undoubtedly did not contemplate. While the parties cite no Tennessee authority directly on point, the Court has located cases from other jurisdictions which have identical versions of the Uniform Commercial Code and which support this Court's conclusion that there was a sale for purposes of T.C.A. § 47-2-314 in this case. See, Levondosky v. Marina Associates, 731 F.Supp. 1210, 1212 (D.N.J. 1990)(sale occurred for purposes of Section 2-314 of the Uniform Commercial Code when casino cocktail waitress gave patron a drink since casino was "not offering these drinks out of any sense of hospitality or charity"); Barker v. Allied Supermarket, 596 P.2d 870, 871 (Okla. 1979)("taking possession of goods from a self-service display coupled with the intent to pay for them is sufficient to create a Section 2-314 'contract for their sale' which gives rise to the implied warranty of merchantability"); Fender v. Colonial Stores, Inc., 225 S.E.2d 691, 693 (Ga. App. 1976)(placing goods on shelf of self-service food store for customer inspection and selection constituted offer to sell such goods at stated price, and customer's act of taking physical possession of goods with intent to pay for them constituted reasonable mode of acceptance, so that contract for sale of goods came into being at such time).

17

Finally in regard to Plaintiff's claim for breach of implied warranty, Petco argues that it was not a "merchant" because its business focuses on selling items for pets, not food for human consumption. However, the statute defines "merchant" as "a person who deals in goods of the kind" at issue, T.C.A. § 47-2-304(1), and imposes an implied warranty of merchantability "if the seller is a merchant with respect to goods of that kind." T.C.A. § 47-2-314(1). Here, the undisputed evidence is that Petco sold candies and soft drinks in addition to pet supplies and therefore it was a "merchant" for purposes of the statute.

Petco also seeks summary judgment insofar as Plaintiff is asserting a strict liability claim against it. T.C.A. § 29-28-106(b) provides:

> (b) No "product liability action," as defined in § 29-28-102(6), when based on the doctrine of strict liability in tort, shall be commenced or maintained against any seller of a product which is alleged to contain or possess a defective condition unreasonably dangerous to the buyer, user or consumer unless the seller is also the manufacturer of the product or the manufacturer of the part thereof claimed to be defective, or unless the manufacturer of the product or part in question shall not be subject to service of process in the state of Tennessee or service cannot be secured by the long-arm statutes of Tennessee or unless such manufacturer has been judicially declared insolvent.

T.C.A. § 29-28-106(b). This statutory provision clearly permits a strict liability action against a seller only when the seller "is also the manufacturer, or when the manufacturer cannot be located and served, or when the manufacturer has been declared judicially insolvent," Shoemaker v. Omniquip Intern. Inc., 152 S.W.3d 567, 571 (Tenn. Ct. App. 2003), none of which exists in this case. Accordingly, the Court will grant summary judgment on Plaintiff's strict liability claim against Petco.

Finally, Petco moves for summary judgment on Plaintiff's negligence *per se* claim. In order to recover under the theory of negligence *per se*, Plaintiff must show that (1) defendant violated a

18

statute or ordinance that imposes a duty for the benefit of a person or the public, (2) plaintiff is within the class of persons to be protected by the statute or ordinance, and (3) that the negligence was the proximate cause of injury."  Harden v. Danek Medical, Inc., 985 S.W.2d 449, 453 (Tenn. Ct. App. 1998).

In this case, Plaintiff points to both the Federal Food, Drug, and Cosmetic Act ("FFDCA"), 21 U.S.C. 301 *et seq.*, and the Tennessee Food, Drug and Cosmetic Act, T.C.A. § 53-1-101 *et seq.* ("TFDCA"), as statutes which Petco allegedly violated to Plaintiff's detriment.  However, the Sixth Circuit has held that there is no private cause of action for violation of the FFDCA and therefore no basis for a negligence *per se* claim linked to an alleged violation of its provisions.  See, Kemp v. Medtronic, Inc., 231 F.3d 216, 236 (6th Cir. 2000)(collecting cases).  The rationale behind such a holding is that the language of the Act and its legislative history evidences Congress' intent that the FFDCA should only be enforced by the government.  Cupek v. Medtronic, Inc., 405 F.3d 421, 424 (6th Cir. 2007); Bailey v. Johnson, 48 F.3d 965, 967 (6th Cir. 1995).  Similarly, the TFDCA, which is modeled after the FFDCA, Merck and Co. v. Kidd, 242 F.2d 592, 594 (6th Cir. 1957), places authority in the Commissioner to police violations, T.C.A. §§ 53-1-201 – § 53-1-210, and places the duty on the district attorney general or city attorney to whom the Commissioner reports violations to bring appropriate proceedings in "the proper court." T.C.A. § 53-1-203.

Moreover, Plaintiff does not point to the specific statutory provisions under the FFDCA or TFDCA which Petco is alleged to have violated.  Thus, the Court cannot determine whether either statute sets forth a duty, the violation of which would constitute negligence *per se.* See, King v. Danek Medical, Inc., 37 S.W.3d 429, 460 (Tenn. Ct. App. 2000)("When alleging a statute or regulation based negligence *per se* claim, it is not sufficient for a plaintiff to assume . . . that the

alleged violation of a statute automatically supports a claim of negligence *per se*" because "[e]ven if the plaintiffs are within the class to be protected . . . a statutory negligence *per se* claim cannot stand unless the statute establishes a standard of care."); Rains v. Bend of the River, 124 S.W.3d 580, 590 (Tenn. Ct. App. 2003)("The negligence *per se* doctrine is not a magic transformational formula that automatically creates a private negligence cause of action for the violation of every statute" and "[n]ot every statutory violation amounts to negligence *per se*").  Accordingly, summary judgment will be granted on Plaintiff's negligence *per se* claim.

**C.  Petco's Motion for Partial Summary Judgment on the Issue of Punitive Damages** (Docket Entry No. 57)

In Goff v. Elmo Greer & Sons Const., Inc., 297 S.W.3d 175, 186 (Tenn. 2009), the Tennessee Supreme Court recently reiterated that punitive damages are "appropriate only in the most egregious cases and, consequently, a verdict imposing such damages must be supported by clear and convincing evidence that the defendant acted intentionally, fraudulently, maliciously or recklessly." "Evidence is clear and convincing when it leaves 'no serious or substantial doubt about the correctness of the conclusions drawn.'" Id. (citation omitted).   "In other words, the evidence must be such that the truth of the facts asserted be 'highly probable,'" id., which "produces in the fact-finder's mind a firm belief or conviction of the truth of the facts sought to be established." Flax v. DaimlerChrysler Corp., 272 S.W.3d 521, 555 (Tenn. 2008).

In this case, Plaintiff seeks to hold Petco liable for punitive damages solely on the grounds that it acted "recklessly."  Specifically, Plaintiff asserts that Petco, as a company, knew or should have known of the problems caused by infestation of insects such as the Almond Meal and Indian Meal moths whose main diet consists of grains found in animal foods, and should have known that such moths would seek out confectionaries such as York Peppermint Patties since those moths have

20

been reported to feed on 112 commodities. In support of this position, Plaintiff relies upon the November 23, 2009 Affidavit of Dr. Subramanyam and a June 19, 2008 FDA News Release.

In his Affidavit, Dr. Subramanyam states that in 2001 he surveyed eight Petco Stores in Kansas and found that all of those stores had stored product insects, which are not uncommon in retail grocery stores and pet stores. Notwithstanding this risk, such stores fail to take proper actions, costing "retail stores and grocery/pet food manufacturers millions of dollars annually, because of product loss, customer complaints, and loss of consumer confidence and good will." (Dr. Subramanyam Aff. ¶8). During his survey, Dr. Subramanyam claims that store employees were not motivated or trained to respond properly to infestation and that, in this case, Ms. Darty stated in her deposition that she had never been told that there is a high likelihood of "these types of creatures" and that she has not received any type of training on the issue. (Id. ¶ 11). Dr. Subramanyam also notes Ms. Darty testified in her deposition that pest control technicians came to the store approximately once every three months, whereas "[i]t is customary for food companies and retail stores to have pest management professionals come at least every month, sometimes more frequently." (Id. ¶ 12).

The FDA news release upon which Plaintiff relies indicates that on June 19, 2008, at the request of the FDA, United States Marshals seized various animal food products stored under allegedly unsanitary conditions at the Petco Animal Supplies Distribution Center located in Joliet, Illinois. This is the same warehouse which was responsible for supplying animal food to the Cookeville Petco store at the time Plaintiff bit into the Peppermint Pattie.

In response, Petco filed a "Motion to Exclude From Consideration the Untimely Affidavit Testimony of Plaintiff's Designated Expert, Dr. Bhadriraju Subramanyam" (Docket Entry No. 89)

because it contravenes the deadlines contained in the Case Management Order (Docket Entry No. 21).

In the Case Management Order, the deadline for Plaintiff's expert disclosure was July 15, 2009, and the discovery and the expert deposition deadline was October 2, 2009. On the eve of the discovery cut-off, Plaintiff requested that the deadline for expert disclosures be extended to November 1, 2009, but the same was denied by Order of the Magistrate Judge (Docket Entry No. 83). Plaintiff filed Dr. Subramanyam's Affidavit as an attachment to her response to Petco's Motion for Summary Judgment and her response to Petco's Motion for Partial Summary Judgment on Punitive Damages on November 25, 2009. This Affidavit, which added Dr. Subramanyam's observations about the Kansas Petco stores from 2001 and the claim that stores such as Petco should be inspected by pest control experts every months comes some six weeks after the close of discovery.

This Court finds that the untimely affidavit should not be considered in ruling on Petco's Motion for Summary Judgment. A trial court has "broad discretion to exclude untimely disclosed expert witness testimony," Pride v. B.I.C. Corp., 218 F.3d 566, 578 (6th Cir. 2000), as well as "the discretion to refuse the filing of untimely affidavits." Moore v. Coffey, 992 F.2d 1349, 1446 (6th Cir. 1993). While a party has a duty to seasonably supplement expert reports, it must do so within the parameters of the scheduling order and not wait until the end of discovery and attempt to supplement an expert report in opposition to a motion for summary judgment. See, Vance v. United States, 1999 WL 455435 at *5 (6th Cir. 1999). Plaintiff effectively tries to do indirectly that which she was being prohibited from doing directly – supplement her expert's report.

Yet even if the Court considers Dr. Subramanyam's untimely affidavit and the FDA news release, summary judgment is appropriate on the issue of punitive damages because Plaintiff has

22

presented nothing close to clear and convincing evidence from which a jury could conclude that Petco acted recklessly. "A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 (Tenn. 1992). "The requirement of recklessness imposes on [Ms. Gentry] a significantly heavier burden than a simple negligence claim" and her "burden is made even heavier by the requirement that she prove [Petco's] recklessness by clear and convincing evidence." Duran v. Hyundai Motors America, Inc., 271 S.W.3d 178, 207-08 (Tenn. Ct. App. 2008).

The fact that Dr. Subramanyam may have visited Petco stores in another state almost a decade ago and noticed problems says nothing about the Petco store in this case or the policy of Petco generally as of the time of the incident at issue. His conclusory observation that "food companies and retail stores" generally are inspected for pests once a month says nothing about whether visits by pest technicians once every three months is sufficient. The FDA news release (which at this point is nothing but hearsay and inadmissible for summary judgment purposes) dealt with the possibility of rat and bird infestation in pet food in "permeable packages" stored in a warehouse in Joliet, Illinois and sheds no light on whether Petco consciously disregarded a substantial and unjustifiable risk which grossly deviated from the standard of care in the manner in which they displayed and sold foil-sealed packages of York Peppermint Patties at its Cookeville store. At most, such "evidence" supports a claim of simple negligence. It does not present clear and convincing evidence from which a jury could find that Petco was reckless.

# IV.  CONCLUSION

Based upon the foregoing, Liberty Distribution's and Hershey's Motions for Summary Judgment (Docket Entry Nos. 51 & 56) will be granted (thereby mooting Liberty Distribution's request that Plaintiff's punitive damages claim against it be dismissed (Docket Entry No. 54)), but Hershey's request that the Court enter final judgment as to it will be denied.  Petco's Motion for Summary Judgment (Docket Entry No. 62) will be granted with respect to Plaintiff's strict liability, breach of express warranty and negligence *per se* claims, but denied with respect to Plaintiff's other claims for compensatory damages.  Petco's Motion for Partial Summary Judgment on the Issue of Punitive Damages (Docket Entry No.  57) will be granted, thereby mooting Petco's "Motion to Bifurcate Damages Issues at Trial" (Docket Entry No. 65).  Finally, Petco's Motion to Exclude From Consideration the Untimely Affidavit Testimony of Plaintiff's Designated Expert (Docket Entry No. 89) will be granted.

An appropriate Order will be entered.


ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE